OPINION
This case arises from a three day suspension given to Kristian Siemon in May, 2000, by the administration at Northwestern High School. Allegedly, on May 3, 2000, Kristian defecated into a plastic bag and took the bag outside the high school with the intent of smearing the feces on another student's automobile. After unsuccessfully appealing the suspension to the superintendent, Kristian and his father, Brian Siemon, filed a complaint against the high school principal, Northwestern High School, the superintendent, and the Northwestern Local School District Board of Education (collectively, Board). The complaint was for "injunctive relief and appeal pursuant to R.C. 2506.01," and was filed in the Clark County Common Pleas Court.
Because the trial court did not grant injunctive relief, Kristian served the suspension. Kristian then graduated from Northwestern in June, 2000. Subsequently, in September, 2000, the trial court affirmed the suspension decision. On appeal to our court, the Siemons claimed that the trial court had erred by affirming the suspension without due process, a fair hearing, or a verbatim record. After considering the matter, we reversed and remanded the case for a full hearing on the validity of the Siemons' claims. The basis for our decision was the lack of evidence in the record concerning whether the Board had complied with due process requirements. See Siemon v. Bailey (Apr. 6, 2001), Clark App. No. 2000 CA 81, 2000 WL 331921.
On the other hand, our opinion also noted that the case might be moot, since the Board had said during oral argument that Kristian's suspension was "expunged" from his records when he graduated. We analogized the situation to misdemeanor conviction appeals, which are moot unless the defendant can show that he or she suffered a collateral disability or loss of civil rights as a result of a conviction. 2000 WL 331921, *2.
After remand, the Board filed a motion to dismiss, claiming that the pertinent records had been appropriately "expunged," and that Kristian had suffered no collateral disability as a result of the suspension. To support its claims, the Board attached the superintendent's affidavit, which indicated that suspension records are collected at the end of each school year and are kept with other annual files that the Board must retain. Individual student information is kept separately, in accumulative folders, which include information like the student's transcript, attendance and test scores, health information, and so on. When an authorized individual or institution requests a copy of a student's transcript, only the two-page transcript is sent, not disciplinary records or information.
The Board also attached a copy of Kristian's transcript and Ohio proficiency test results, apparently to show that no disciplinary information was included. In responding to the motion to dismiss, Kristian contended (based solely on the superintendent's affidavit) that his suspension records had not, in fact, been sealed or expunged. In addition, Kristian claimed he had suffered a "collateral disability," because he was denied the chance to take exams scheduled during his suspension. A "notarized letter" attached to the memorandum indicated that Kristian missed tests in English and Latin III, and had received zeros in other classes on all assignments during the three day suspension. A copy of Kristian's report card was also included, and showed that he received lower grades for the second nine weeks of the grading period, i.e., during the nine weeks in which the suspension occurred. Kristian made other allegations in the text of the memorandum about expenses for the prom (which took place during his suspension), and for attorney fees. However, no documentation or affidavits were submitted concerning these matters.
Subsequently, the trial court found that the matter was moot because Kristian had served the suspension, had graduated, and had shown no collateral disability or loss of a civil right. Kristian now appeals, raising as a single assignment of error that the trial court erred in granting the motion to dismiss. Specifically, Kristian contends that the records were not expunged, and that he has actually suffered a collateral disability.
Mootness is based on the fact that courts have no duty to decide "purely academic or abstract questions." James A. Keller, Inc. v.Flaherty (1991), 74 Ohio App.3d 788, 791. Therefore, if intervening events prevent a court from granting effective relief, an appeal should be dismissed. Id. Two exceptions exist, however. The first is that "[a] case is not moot if the issues are capable of repetition, yet evading review." In re Suspension of Huffer from Circleville HighSchool (1989), 47 Ohio St.3d 12, paragraph one of the syllabus. This situation is limited to:
 "exceptional circumstances in which the following two factors are both present: (1) the challenged action is too short in its duration to be fully litigated before its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." State ex rel. Calvary v. Upper Arlington
(2000), 89 Ohio St.3d 229, 231, 2001-Ohio-142
(citations omitted).
The second exception to the mootness doctrine is that jurisdiction will be exercised where the case "involves a matter of public or great general interest." Huffer, 47 Ohio St.3d at 14.
Huffer involved a situation somewhat like the present, as the student had been suspended from high school, but had graduated before the case could be heard. The Ohio Supreme Court decided to hear the case anyway, based on both the above exceptions. Specifically, the court noted that:
 "[t]he issue of the authority of local school boards to make rules and regulations is of "great general interest." The issue before us is certainly "capable of repetition," yet it may "evade review," since students who challenge school board rules generally graduate before the case winds its way through the court system. For these reasons, we decide this issue of school board authority." Id.
However, the mere fact that a student may graduate before the case is resolved does not make the case one that is capable of repetition, but evading review. Instead, this fact satisfies only one requirement, i.e., that "the challenged action is too short in its duration to be fully litigated before its cessation or expiration." Calvary,89 Ohio St.3d at 231. As we mentioned, the second criterion is that "there is a reasonable expectation that the same complaining party will be subject to the same action again." Id. Although this latter factor was not present in Huffer, the court did find the case of public or great general interest due to the challenge to the school board's authority to make rules. 47 Ohio St.3d at 14.
Cases involving short school suspensions present unique difficulties, because any suspension is typically served long before the court action is resolved. Frequently, as is the case here, the student also graduates or moves on to another school while the case is pending. Courts are, therefore, faced with a choice between ignoring potential defects or intervening where the potential for a meaningful remedy is minimal. This choice, in turn, is further complicated by the fact that many of these lawsuits bring to mind the phrase, "tempest in a teapot." Admittedly, a school suspension is not a completely trivial occurrence, and justice is poorly served when administrators fail to comply with due process requirements. For example, in the present case, the school admitted violating its own policy and R.C. 3313.66(E) by failing to make a verbatim record of the appeal hearing. The purpose of such requirements is to ensure an adequate record for reviewing courts. Consequently, if the school fails to make an appropriate record, the review process can be hampered.
On the other hand, the student in this case has never denied being involved in what can only be described as an unsavory incident. Specifically, the materials filed with the trial court do not contest Kristian's involvement, nor do they suggest witnesses who might exonerate him. As we implied in our previous opinion, the factual material Kristian submitted raises an issue at most concerning whether Kristian, himself, defecated in a bag, or whether someone else gave Kristian the feces, which were then smeared on an auto in the school parking lot. In this regard, Kristian's rather incomplete affidavit alleged only that "[t]he individual that gave me the bag which [sic] lead to my suspension was Joe Pickarsi." Siemon, 2001 WL 331921, *2. However, neither set of facts suggests a situation in which suspension would be unjustified.
In any event, Kristian contends that this matter is not moot because the Board has not "expunged" his records. Expungement requests typically take place in the context of criminal cases, although some civil applications do exist. See R.C. 3345.23(D) (allowing expungement of student or faculty dismissal from university records if a judicial decision results in acquittal on criminal charges or conviction is reversed), and R.C. 5122.09 (authorizing expungement of records relating to mentally ill persons who are involuntarily hospitalized and are released from custody before having an initial hearing). In this regard, Kristian claims that we should apply the definition for expunging records of involuntary hospitalization of the mentally ill. Expunge is defined in this context as:
 "(1) The removal and destruction of court files and records, originals and copies, and the deletion of all index references;
 "(2) The reporting to the person of the nature and extent of any information about him transmitted to any other person by the court;
 "(3) Otherwise insuring that any examination of court files and records in question shall show no record whatever with respect to the person;
 "(4) That all rights and privileges are restored, and that the person, the court, and any other person may properly reply that no such record exists, as to any matter expunged." R.C. 5122.01(R).
According to the Ohio Supreme Court, expungement is based on the constitutional right to privacy. City of Pepper Pike v. Doe (1981),66 Ohio St.2d 374, 377 (citations omitted). As a result, when trial courts exercise expungement powers, they should "use a balancing test, which weighs the interest of the accused in his good name and right to be free from unwarranted punishment against the legitimate need of government to maintain records." Id.
When Pepper Pike was decided, no statutory procedure existed for expunging records of offenders who were charged with crimes but had not been convicted. As a result, the Ohio Supreme Court fashioned a remedy, based on the statute that allowed expungement of convictions of first-time offenders, i.e., R.C. 2953.32. Id. In discussing what standards should apply, the court remarked that there is an "inherent lack of precision in the term expungement." Id. The court also noted that even under R.C. 2953.32,
 "expungement does not literally obliterate the criminal record. The sealed record of the case may be inspected by any law enforcement authority or prosecutor to aid in the decision to file charges on any subsequent offenses involving the defendant. * * * The information may be recited in the charging document. * * * An expunged record of conviction may be used where otherwise admissible as evidence in any criminal proceeding. * * * Further, the record may be used by anyone specifically authorized by the defendant whose record was expunged and sealed. * * *
"To make the right of expungement uniform in this state, we follow the guidelines set out in Ohio's criminal expungement statute, and conclude that the government, even after expungement, is entitled to retain the record of appellant's arrest in its appropriate files. It will remain an historical event, available for use in legitimate criminal investigations, and as the appellant may direct. At the same time, appellant will be spared the economic, social, and legal consequences which might accompany routine handling of the records in question, and is entitled to destruction of such ancillary records as witness' statements and departmental reports." Id. at 378.
Since the present situation is not criminal, we do not think strict "expungement" is required. By analogy, however, if expungement principles are applied, the Board would be entitled to retain the record of suspension in appropriate files, as a historical event. By the same token, Kristian would be spared the consequences that might accompany routine handling of the records. The issue, therefore, is whether the Board's procedures satisfy these requirements.
As we said earlier, an affidavit from the superintendent of schools indicates that suspension records are not kept in the files of individual students. Instead, the school keeps a copy of information about the suspension in a "yearly" suspension file in the assistant principal's office. Another copy is kept in the "yearly" suspension file in the superintendent's office. Each year, the suspension file is moved and is kept with other annual files the Board must maintain. This is similar to the "historical record" mentioned in Pepper Pike, that the government is entitled to maintain. Since the suspension records are accessed by year, rather than by student name, a particular student's record would not be easily identifiable.
In contrast, all other high school student information, including transcript, grades, attendance, test scores, etc., is kept in each student's accumulative folder in the guidance office. When students graduate, their files are alphabetized and placed with graduate files, in the conference room of the high school. Consequently, an individual student's file may be easily located, but will not contain suspension information.
The superintendent also stated that no disciplinary information is sent when transcripts are requested by colleges. Occasionally, a college may send a "character sheet" requesting certain information about a student. If this is the case, the information request is answered and a character sheet is sent with the transcript. Notably, although about a year and a half had elapsed since Kristian's graduation, no evidence was submitted to indicate that any character information had been requested from the school, or had been transmitted. In fact, counsel indicated during oral argument that Kristian had already completed a year of college and was transferring to a different university for his second year. As a result, there was no evidence (or at least none was offered) that Kristian had suffered any consequences, whatsoever, from routine handling of his file.
Under the circumstances, we think the purposes of "expungement" have been satisfied. Kristian's permanent record does not contain any reference to the suspension, and even if a "character sheet" is sent to the high school, Kristian's file will not contain any relevant information that can be communicated. While someone, knowing of Kristian's years of school attendance, could conceivably take the time to search through all yearly records to find any disciplinary infractions, this possibility is extremely remote. It is also highly speculative. As we said, Kristian has been accepted in college and has already completed one year.
In our prior opinion, we analogized this case to those involving misdemeanor convictions, in which appeals are moot unless defendants can prove a collateral disability. Siemon, 2001 WL 331921, *3. In this regard, we cited State v. Wilson (1975), 41 Ohio St.2d 236, which held that:
 "[w]here a defendant, convicted of a criminal offense, has voluntarily paid the fine or completed the sentence for that offense, an appeal is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction." Id. at syllabus.
Following our suggestion, the trial court decided that Kristian had suffered no collateral disability or loss of civil right. On appeal, Kristian claims that he did, in fact, suffer collateral disabilities, including out of pocket expenses for the prom, attorney fees, and an impaired grade transcript. In addition, Kristian claims he has lost the civil right of "due process."
Upon review, we think our analogy to collateral disability and loss of civil rights may have been inappropriate. Typically, such issues are pertinent to the mootness of criminal convictions, not civil actions. Although collateral disability has been applied in some limited civil or quasi-criminal situations, they differ from the present situation. For example, in the case of In re Klepper (1977), 49 Ohio St.2d 211, the Ohio Supreme Court held that an involuntarily committed patient's release from a mental hospital did not moot a habeas petition, because collateral disability issues remained. Specifically, at that time, express statutory consequences like deprivation of the right to drive an automobile, or the right to serve on a jury, followed an adjudication of mental incompetency. Id. See, also, In re Fisher (1974),39 Ohio St.2d 71, 80. No such statutory disabilities exist for school suspensions, and we can find no basis in Ohio law for applying a collateral disability rule in this case.
A more appropriate analytical approach is the one typically used in civil cases, and which is subject to the two exceptions we mentioned, i.e., that the case is "capable of repetition, yet evading review," or involves matters of public or great general interest. Huffer,47 Ohio St.3d at 12 and 14. However, even if we were considering "collateral disabilities," we see no evidence that they exist. A collateral disability is a legal consequence that attaches as a result of a conviction, like loss of the right to drive an automobile, inability to vote in elections, and so forth. Wilson, 41 Ohio St.2d at 237; Klepper,49 Ohio St.2d at 211. Further, a defendant (in this case, the suspended student) has the burden of proving that he has "a `substantial stake in the judgment of conviction.'" State v. Golston (1994), 71 Ohio St.3d 224,237.
In the present case, no legal consequences attached to the suspension. Although Kristian may have spent $200 on the prom he missed (a fact that is not established by the record), or may have suffered a decline in grades for one nine-week grading period (also not proven), these were not collateral disabilities as that term is used in the case law. As an aside, we note that Kristian's grade-point average remained constant through four years of high school, ranging between a low of 2.417 (sophomore) to a high of 2.67 (senior). His class rank also remained about the same, i.e., he was ranked 86th (sophomore), 83rd (junior), and 87th (senior), out of about 153 students. This was not a situation of a high-achieving student being deprived of a chance to be class valedictorian or to obtain college scholarships (or at least the record does not so indicate). However, even if Kristian fit within these categories, such consequences are not collateral disabilities.
Furthermore, while due process rights are important, we have held, even in the criminal context, that a case involving fundamentally unfair contempt proceedings was moot because the defendant had served his sentence. See City of Springfield v. Myers (1988), 43 Ohio App.3d 21,22. Therefore, even if we applied the concept of collateral disability or loss of civil rights, we would still find that this case is moot. As we said, though, that approach is not appropriate.
A second exception to mootness applies where the case involves matters of public or great general interest. Huffer, 47 Ohio St.3d at 14. However, the matters raised in the present case do not even arguably qualify for this exception. In this regard, Dreyfus v. Lakewood CitySchools (Sept. 5, 1996), Cuyahoga App. No. 70004, 1996 WL 502149, is instructive. In Dreyfus, a middle school student was suspended for two days for allegedly improperly touching a female student's breast. Although the school board found that the two-day suspension was appropriate, it also informed the parents that the letter of suspension would be removed from the student's permanent record, due to a late postmark on a suspension letter that had been sent to the parents. 1996 WL 502149, *2.
Subsequently, the case was appealed to the common pleas court, and was dismissed as moot because the student had already served the suspension. The Eighth District Court of Appeals then affirmed the dismissal. In doing so, the Eighth District distinguished Huffer, noting that:
 "[i]n Huffer, the appellant challenged the authority of the school board to make and enforce school policy, as well as the constitutionality of Policy No. 622 [which prohibited students from being "under the influence" of any alcoholic beverage]. In the present case, however, Dreyfus [the student] did not challenge the authority of the board, nor did Dreyfus challenge any school policy applicable to his situation. Rather, Dreyfus, in essence, has asked the court to determine whether his suspension was supported by sufficient evidence." Id. at *3 (parenthetical material added).
The Eighth District also noted that the suspension had been served and any reference had been removed from the permanent record. And finally, the Eighth District observed that the issue was not one that was capable of repetition, yet evading review, since the student was no longer enrolled at the middle school.
Like the student in Dreyfus, Siemon does not challenge either a school board rule or the Board's authority to make rules. As best we can tell, what Siemon is actually upset about is that another student who was allegedly involved in the incident was not suspended and was allowed to play in a baseball tournament that weekend. This is not a matter of public or great general interest, nor is it something for which a remedy can be granted at this point.
In their brief, the Siemons rely heavily on DeCastro v. Wellston CitySchool Dist. Bd. of Edn. (2002), 94 Ohio St.3d 197, 2002-Ohio-478. InDeCastro, a high school senior was suspended the last four days of school for allegedly throwing an egg at a teacher who arrived to replace striking teachers. The student then sued for breach of contract, based on a written agreement between the school board and a teachers' union. According to the agreement, no reprisals would be made against union members, students, or parents for activities related to the strike. In view of the board's alleged breach, the student asked for compensatory damages, attorney fees, and costs. 94 Ohio St.3d at 198.
The trial court granted summary judgment because the student had neither alleged nor sustained any economic losses. Ultimately, the question before the Ohio Supreme Court was "whether nominal damages can be recovered where actual monetary damages cannot be proven in a breach of contract claim." Id. at 199. Although the court decided that such damages could generally be recovered, it also held that "unless a significant right is involved, including inequitable assessment of costs, an appellate court should not reverse and remand a case for a new trial if only nominal damages could result." Id. at 200. The court also held that summary judgment could be granted in a breach of contract case if the plaintiff fails to provide evidence of economic damages and fails to seek injunctive relief or specific performance of a contractual duty. Id. at 201.
Since the student in DeCastro acknowledged that he had suffered no out of pocket expenses as a result of the suspension, and did not seek injunctive relief or specific performance, the Ohio Supreme Court also concluded that summary judgment had been properly granted. Id. at 201-202. Based on these facts, and the Ohio Supreme Court's remark that "wrongful imposition of school suspension is not a trivial matter," Kristian argues that he is entitled to relief.
As a preliminary point, we note that Kristian made this argument in the section of his brief that deals with collateral disability or loss of civil rights. Although we rejected that particular analytical approach, we have considered DeCastro. However, after reviewing the case, we do not find it relevant to the issues before us. Specifically, the claims inDeCastro were based on a contract in which the school board promised not to make reprisals against students for certain activities. No such contractual claims are alleged in the present case. To the contrary, Kristian's complaint raises due process and equal protection violations, a violation of Section 1983, Title 42, U.S. Code, a request for injunctive relief, and an R.C. Chap. 2506 appeal from an administrative decision. Therefore, whether alleged money damages (prom expenses) existed in the present case is irrelevant. The only reason money damages were relevant in DeCastro was because of the issue concerning nominal damages and breach of contract. Moreover, as we said, Kristian did not offer evidence about money damages; instead, damages were simply mentioned in the text of his memorandum.
As an additional matter, the Ohio Supreme Court decision in DeCastro is based on considerations similar to those underlying the mootness doctrine. In DeCastro, the court evaluated the long-established principle that plaintiffs in breach of contract actions (unlike tort plaintiffs) are entitled to nominal damages upon proof of breach. 94 Ohio St.3d at 199-200. Despite this established rule, and the existence of an actual breach, the court decided that such cases would not be reversed and remanded for new trial unless a substantial right was involved. Id. at 200. In particular, the court focused on the defendant's waste of time and money in litigation "having no purpose other than to judicially establish that he or she had committed a breach of contract with no economic consequences." Id. at 201. This is very similar to the mootness doctrine, which prevents courts from concerning themselves with controversies that are academic, or are not justiciable, or in which no effective relief can be granted. See, e.g., Central Motors Corp. v. Cityof Pepper Pike (1983), 9 Ohio App.3d 18, 19, and James A. Keller, Inc. (1991), 74 Ohio App.3d 788, 791.
Finally, we note that some discussion took place in oral argument about whether attorney fees might be obtained under Sections 1983 and 1988, Title 42, U.S. Code. We decline to consider this issue, since the Siemons failed to pursue the 1983 claim in the trial court, nor did they mention it in connection with the single assignment of error that was raised in their brief. As we have often said, we will not consider issues that litigants fail to bring to the trial court's attention. Inre O'Herron (July 2, 2000), Montgomery App. Nos. 18213, 18214, 2000 WL 896376, *5. While we could consider such matters under the plain error doctrine, we will not do so where a party fails to even assign the matter as error on appeal. See App.R. 12; App.R. 16(A)(3); Grendell v. OhioEnvironmental Protection Agency (Sept. 12, 2001), Summit App. No. 20237, 2001 WL 1044083, *9; and State v. Lent (1997), 123 Ohio App.3d 149, 156.
Even if we were to consider this point, we note that a party must be a "prevailing party" to recover fees under Section 1983. Gibney v. ToledoBd. of Educ. (1988), 40 Ohio St.3d 152, 158. This means that a plaintiff must succeed on any significant issue that achieved some of the benefit he or she sought in bringing suit. Id. However, no such success occurred in the present case before it became moot. Compare Fenton v.Query (1992), 78 Ohio App.3d 731 (case involving high school student's compliance with the school district's residency policy became moot upon the student's graduation. Nonetheless, since the student had obtained a preliminary injunction against enforcement of the policy before case became moot, he could be considered "prevailing party" for purposes of attorney fee award under Section 1988). Consequently, even if Kristian had properly raised Sections 1983 and 1988, he would not have been a "prevailing party."
In light of the preceding discussion, the single assignment of error is without merit. Accordingly, the judgment of the trial court is affirmed.
FAIN, J., concurs.